In the Matter of MOLLIE LESSER, as Guardian ad Litem for MELVIN LESSER, an Infant, Petitioner, *v.* BOARD OF EDUCATION OF THE CITY OF NEW YORK et al., Respondents.

Supreme Court, Special Term, Kings County, September 18, 1962.

*Solomon Z. Perziger* for petitioner. *Leo A. Larkin, Corporation Counsel (Joseph M. Callahan, Jr.* and *Peter J. Flanagan* of counsel), for respondents.

LOUIS B. HELLER, J. Petitioner, guardian ad litem of her son, an infant over 14 years of age, seeks in this article 78 (Civ. Prac. Act) proceeding, an order directing and commanding respondents to review and adjust upwards the infant's scholastic record so as to properly reflect his scholastic standing, thereafter to reconsider respondents' denial of his application for college admission, and upon *de novo* reconsideration, admission should be granted him as a nontuition-paying student at Brooklyn College for the current academic year.

As here pertinent article XVII of the by-laws of the Board of Higher Education of the City of New York states at page 17.1 as follows: " The Board shall furnish the benefits of collegiate education without charge for tuition to citizens who are bona fide residents of the City of New York and who meet the requirements fixed by the Board for admission to any undergraduate course of study leading to a baccalaureate degree ".

The by-laws (art. VI, p. 7.8) further prescribe that " Registrars shall be responsible to the president for the registration of students, the determination of eligibility for admission ".

Examination of the submitted papers including the exhibits shows that petitioner's son was, upon entering Lafayette High School in September, 1959, induced to participate in a scholarship program intended only for students possessing a superior scholastic intelligence. The selection was made " on the basis of his junior high school record   *   *   *   which includes the top 10% of each entering class in our school." That such enrollment was the result of the urging and inducement at a special conference by the high school's " college advisers " has not been denied by respondents.

The Exhibit (C) annexed to respondents' answer asserts that the scholarship program provides for the intensive pursuit of excellence among the potential scholars of the entering class under the guidance of the best teachers in the school. It further states, with what appears to be much candor and satisfaction, and properly so that "The results of the scholarship program have been so outstanding that several schools have adopted our plan. As a matter of fact, in June, 1961, for the first time in the history of Lafayette High School, we ranked with the top 10 among the 56 academic high schools in New York City winning scholarships and also won many national honors and awards". It further asserts that petitioner's son, a participant in this special scholarship program "won a Regents Scholarship" and "practically 100% of them [students participating in this scholarship bloc] have gained admission to the college of their choice."

Respondents have not controverted nor have they submitted an affidavit denying knowledge of this salutary pilot program which continues to this day with their apparent sanction and approval. Query, why then having participated in this intense scholastic program with which the average student admittedly could not cope, do not the grades of petitioner's son reflect the achievements the high school principal glowingly describes? Yet, in spite of this alleged excellent course, the petitioner's son's record averaged but 84.3% and his application for admission to Brooklyn College as a nontuition-paying student was denied the stated reason given was that he failed to achieve the minimum grade requirement of 85%.

Petitioner predicates her claim for the relief here sought on the alleged assurances of the high school teachers (classified here as "college advisers") that her son *would be* admitted to Brooklyn College by reason of the boy's participation in the high school's "Scholarship Program." The court observes that neither of the named "college advisers" nor other members of the high school faculty have filed an affidavit denying movant's contention. From the record presented, it reasonably appears that petitioner's son's grade average would have been higher had he not participated in the scholarship bloc, and had he been permitted to remain with the students who comprised the average class.

Despite the more difficult program, Melvin Lesser did attain a respectable grade of 84.3 for his high school years. He did well in most courses, and in some of the more difficult ones, such as math and science, he excelled, getting averages of 85 or better. At no time was any fault found with his personal con-

duct or his relationships to his students or teachers. In other words, he proved to be a good student and a good citizen of the school.

It is pertinent to the issues involved in this case to note that recently the State Education Department, after receiving complaints that the Summer-school Regents examinations were too difficult and severe, lowered the passing grades from 65% to 55% boosting 3,900 students who failed the examination into passing grades. It is, therefore, seen that " adjustments " are made by the education authorities. It is evident from the circumstances here shown to exist that an adjustment upwards from 84.3 to at least 85% in the grades of petitioner's son would have been just and proper. " The courts will intervene   *   *   * if a board of education has acted unreasonably and therefore has abused its discretion." (Reutter, Schools and the Law, p. 29.)

In the world of today, with the Nation through its leaders proclaiming that our children represent its greatest resources, what better incentive and spur can we provide them with than to encourage the development of their mental capacities through challenging programs such as the one movant's son enrolled in, allegedly at the behest and urging of his college advisers. The issue here is plain for albeit the ire of the high school principal is manifest, when he cites " the excessive parental pressure " employed by petitioner, he very frankly and amiably concludes his letter to the Assistant Superintendent with the assurance that " I will do whatever you suggest." It is thus indicated that he awaits the direction of the Superintendent, even to an adjustment upward that would benefit the Lesser boy.

The court commends both mother and son for striving and reaching out in a sincere effort to satiate his hunger for education. It is especially in this day gratifying to know that elders and youth alike strive and seek to achieve the light that only knowledge can bring. Being confronted with a true exemplification of our youth's thirst and yearning for higher educational values and status, augurs well for the future of our citizenry and our community.

The court recognizes the great need for engineers, physicians and scientists. The shortages in these professions may be due in large measure to our failure to ferret out our bright youngsters of superior intellectual potentialities and encourage them to pursue their studies. The respondents in this instance are not functioning in accordance with the needs of the changing times. I find that the determination reached by respondents is arbitrary, inexpedient and in opposition to the mores of the

times. It is pertinent here to note that on the oral argument, the court inquired of respondents' counsel, if he was conversant with the criticism by leading educators of the value and importance of aptitude tests. The court specifically asked him "Frankly, haven't these aptitude tests been overrated and criticized?" and the Corporation Counsel was frank to admit that the statement was correct.

We cannot dispute the right of the colleges to set the standards for admission, based on their needs. But the way these standards are interpreted presents a more difficult problem. Should the admissions officers merely accept a figure, punched out on an IBM machine, and then mechanically admit students? Is the 85 average to be a hard and fast cut-off point for admission? That, of course, is the easiest and most feasible administrative policy. It is much more difficult, on the other hand, to evaluate each student's record, to see whether the 85 is based on "hard" or "easy" courses, and to see whether the student has lowered his average by attending stimulating, challenging and more difficult programs. This is the normal procedure followed in our better colleges and universities throughout the land, and surely in our private colleges that seek the best brains. Our city colleges can afford no less. They must adopt the same high principles that the best private colleges have developed, regardless of additional administrative work.

It appears that this is not being done at Brooklyn College now. In a letter to the mother of the young student, Dr. Harry D. Gideonse, President of Brooklyn College (dated Feb. 28, 1962) wrote that "in computing high school averages the Registrars of the municipal colleges do not give special weight to honors courses nor to grades received by students in high schools with special admission requirements, such as the Bronx High School of Science or Stuyvesant. I regret therefore to inform you *that no adjustment is possible in your son's averages because some of his subjects were scholarship courses.*" (Emphasis supplied.) The court is of the opinion that this is the crux of the present litigation. If the colleges do not give special weight to honors courses, and this fact becomes generally known, why would a young man or woman want to enter upon such a program? Why should parents advise their sons or daughters to take the more difficult program, which not only gives them far more work but jeopardizes their chances of gaining admission to one of the city colleges?

Why should guidance counselors take the frightful responsibility of misguiding and advising students to enter the scholar-

ship programs, as was done in this case with the probability of attaining a lower grade average than students taking the regular courses, thus lessening their chances of entering college? No such penalty should be imposed. The guidance counselors in our high schools should evaluate the regular and special scholarship honors programs and come up with an equitable weighting formula which would truly reflect the student's capabilities.

We must encourage scholarship. We must encourage sound training and learning. This can be done if the municipal colleges recognize that quality is more important than quantity. If the colleges persist in admitting students who have passed a certain number of courses, and have obtained the mark of 85, and do not go beyond this robotized process, we are indeed in serious trouble. Our students will be more concerned with gaining the magic number of 85, and not at all concerned with how they get it. They will be inclined to take " easy " courses from teachers that have the reputation of giving out high grades. They will be less inclined, unless they are very idealistic, to take difficult programs of advanced study, or subjects that will require additional hours of study and concentration.

This revised process of admitting students will require serious thought on the part of our administrators, college presidents and admissions officers. It may require a basic reorientation in educational philosophy. Quality is hard to measure, but it is measurable. For too long have our municipal colleges relied on quantity, on accumulated grades, rather than on an evaluation of these grades in terms of their meaning to the individual, the college, the city, State and Nation.

School reform is always difficult. As Admiral Rickover testified at a hearing before the Committee on Appropriations of the House of Representatives, 87th Congress (p. 19): " *School reform is nothing new or unusual. At one time or another almost every country has found its schools no longer functioning in accord with the needs of changing times. Schools have to be continuously examined to make certain they stick to their assigned role among the country's various agencies for social improvement and progress. Of course, reform is always painful to those whose habitual ways will be upset. In no country has it been accomplished without travail. And the educational establishment of almost every country has fought against reform.*" (Emphasis supplied.)

The court declines to canonize the principles of law enunciated in the respondents' brief, which cites numerous cases wherein the court's power to set aside the board's findings are circumscribed. Where is the line of demarcation? This court cannot

accept these principles and apply them as a solvent in the instant case. Here, flexibility founded on reason must be invoked; to do otherwise would prove to be a gross injustice to this infant who concededly relied upon his teachers' counsel and advice that he would find college entrance no difficulty were he to enter the subject pilot class. The court's assessment of respondents' Exhibit (C) is that contrary to its intention, its substance benefits the petitioner's claim for relief. In view of the contentions of this exhibit, it appears that the high school was remiss in failing to give due credit for, and in not indicating on the college transcripts, petitioner's son's enrollment in the so-called "Scholarship Bloc." Especially is this apparent, since the high school principal in his letter to the Assistant Superintendent to which the court has referred, in glowing and proud terms describes the importance of the scholarship class wherein honor students from the top 10% of each class entering a school are selected. Why then was this scholastic fact not incorporated in the Lesser transcript?

The court finds merit to petitioner's claim. It is well settled that the courts may review the discretionary act of an administrative officer or body to determine whether the discretion has been exercised in an arbitrary or capricious manner (*Matter of Jeanpierre* v. *Arbury*, 4 N Y 2d 238; *Matter of Diocese of Rochester* v. *Planning Bd.*, 1 N Y 2d 508, 526).

The court finds that respondents failed to properly evaluate, estimate and calculate and give credit for all the scholastic achievements to which the Lesser boy was entitled as warranted by this record. In the opinion of the court the respondents' determination was arbitrary, capricious and unreasonable. The petition is, accordingly, granted and the matter remanded to respondents for the purpose of forthwith reconsidering movant's son's application for admission and redetermining and adjusting upwards his grade to the minimal entrance requirement and that he thereupon be enrolled in Brooklyn College this current term in accordance with the views expressed herein.